IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JACINTO ARREDONDO and
MARISELA OLIVAS,

        Plaintiffs,

v.                                  CIV 03-156 KBM/LCS

NAOMI LOCKLEAR,
REBECCA BARRERA-GARCIA,[1]
MIKE PITTS and RUDY ARREY,

        Defendants.

# MEMORANDUM OPINION AND ORDER

      Plaintiffs bring this action under 42 U.S.C. § 1983, seeking damages for the removal of

their children during the course of a child abuse investigation.  Defendants are the social workers

and police officers who were involved in the investigation and/or made the decision to remove the

children.  They are sued in their individual capacities only.  *See Docs. 8, 12, 36.*

      Plaintiffs' Fourth Amendment "warrantless entry" claim was dismissed, and I do not read

their Third Amended Complaint as asserting any state law claims.[2]  Accordingly, the sole

remaining claim asks whether failure to give Plaintiffs notice and a hearing before removing the

---

[1] Since Mr. Barrera-Garcia signs her name as "Rebecca Garcia," for ease of reference, I do not
use her hyphenated name.  *See Doc. 90,* Exhs. G, Q.

[2] Although paragraph 28 of Plaintiffs' Third Amended Complaint states that the "actions set forth
hereinabove violated New Mexico law," elsewhere they assert that their "causes of action" arise under the
federal constitution and § 1983 and, therefore, jurisdiction is proper in this Court.  *See Doc. 36,* ¶¶ 7, 28.
They have not asked this Court to assert supplemental jurisdiction over any state claims, *see id.,* their
cross-motion for summary judgment is not based on a state law claim.  *See Doc. 87.*  Moreover, in
response to a defense motion they argue that state law is immaterial to the constitutional right they seek to
enforce – the deprivation of their children without a hearing. *See Doc. 99* at 19.  Indeed, a violation of state
law alone cannot provide the basis for recovery under § 1983.  *E.g., Rector v. City and County of Denver,*
348 F.3d 935, 947 (10th Cir. 2003).

children violated due process.[3]

The matter is before me on Defendants' motions for summary judgment on the issue of qualified immunity.  *Docs. 84, 89, 91.*  Plaintiffs also filed a motion for summary judgment, but briefing was stayed pending resolution of the qualified immunity issues.  *Docs. 87, 94, 97.*  Despite the stay in briefing on Plaintiffs' motion, this case is actually in a cross-motion posture, since Plaintiffs' responses reiterate the same arguments and facts that they asserted in support of the argument that summary judgment should issue in their favor.  *Compare Doc. 87, with Docs. 98-100.*

Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.  The parties' submissions and the cases they cited have been carefully reviewed, and I have conducted my own research of relevant authorities as well.  I commend Plaintiffs' counsel on the quality of his advocacy.  Ultimately, however, I find Defendants' motions well-taken and will grant them.  Accordingly, the pretrial conference and trial will be vacated and this matter dismissed.

## I.  Background

### A.  Overview Of Competing Legal Interests

The general constitutional principles that serve as the backdrop for the matter before me are well and long established.  *See, e.g., Troxel v. Granville,* 530 U.S. 57, 66-67 (2000) (and

---

[3]  Although there is some discussion in the briefing regarding whether a post-deprivation hearing was timely provided pursuant to state law, again I do not understand Plaintiffs to be bringing a state law claim.  *See Docs. 34, 87, 98-100; supra,* note 1.  If I have misunderstood, then alternatively I find that if there was a failure to comply with the time-frames set by state law, the delay was at best a day and, in any event, that delay does not violate federal due process.  *See, e.g., Taylor v. Evans,* 72 F. Supp. 2d 298, 308 (S.D.N.Y. 1999); *Kia P. v. McIntyre,* 2 F. Supp. 2d 281, 291-92 (E.D.N.Y. 1998) (and cases cited therein), *aff'd,* 235 F.3d 749 (2nd Cir. 2000), *cert. denied,* 534 U.S. 820 (2001).

Supreme Court cases cited therein); *Parham v. J.R.,* 442 U.S. 584, 602-03 (1989) (same). Parents have constitutionally-protected liberty interest in the custody and care of their children that is of "paramount importance." *J.B. v. Washington County,* 127 F.3d 919, 925 (10th Cir. 1997). Conversely, the State has "traditional and transcendent" interest of "surpassing importance" in "acting as *parens patriae*" to protect "children from physical and sexual abuse." *Id.* at 927.

In due process terms, the balance between these two interests is struck as follows:  if an "emergency" situation exists, then the government officials need not give parents notice and an opportunity to be heard before taking the child into temporary custody.[4]  As the Seventh Circuit put over twenty years ago:  "When a child's safety is threatened, that is justification enough for action first and a hearing afterward." *Lossman v. Pekarske,* 707 F.2d 288, 291 (7th Cir. 1983) (citing *Duchesne v. Sugarman,* 566 F.2d 817, 876 (2nd Cir. 1977)).

### B.  Overview Of New Mexico Child Abuse And Neglect Statutes

Plaintiffs concede that violation of a state law alone cannot serve as a basis for recovery under § 1983. *See Docket No. 99* at 19.  Nevertheless, a review of the New Mexico state laws governing child abuse and neglect may provide a framework to understand the factual background set forth in the next section of this opinion.

The state statutes codify the principle that the State must act to keep children safe, and in

---

[4]     *E.g., Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1245, 1250 (10th Cir. 2003) ("*Roska*"); *Malik v. Arapahoe County Dep't of Soc. Servs.,* 191 F.3d 1306, 1305 (10th Cir. 1999); *see also, e.g., Hollingsworth v. Hill,* 110 F.3d 733, 738-40 (10th Cir. 1997); *see also e.g., Chavez v. Board of County Comm'rs of Curry County,* 130 N.M. 753, 761-62, 31 P.3d 1027, 1035-36 (Ct. App. 2001) (discussing and applying federal law); *Yount v. Millington,* 117 N.M. 95, 101, 869 P.2d 283, 289 (Ct. App. 1993) (same), *cert. denied,* 117 N.M. 121, 869 P.2d 820 (N.M. 1994).

some instances, take temporary custody of them.  *See* N.M. STAT. ANN. §§ 32A-4-1 *et seq.*

Under those statutes, an "abused child" includes a child "who has suffered physical abuse . . .

inflicted or caused by the child's parent" or "who has suffered or who is at risk of suffering

serious harm because of the action or inaction of the child's parent."  *Id.,* §§ 32A-4-2(B)(1), (2).

Physical abuse includes bruises or broken bones for which there is no justifiable explanation or for

which the explanation is at variance with the conditions, but the phrase "serious harm" is not

further defined in the statutes.  *See id.,* § 32A-4-2(F).

Certain people, such as physicians, who have a "reasonable suspicion" that a child is

abused, are required to "immediately" report the same to either law enforcement or the New

Mexico Child, Youth & Families Department "CYFD" (or other appropriate agency when

American Indian children are involved).  *Id.,* § 32A-4-3(A); *see also id.,* § 32A-1-4(F).  Failure to

report is a criminal misdemeanor, which carries a penalty of a jail sentence and/or fine.  *Id.,*

§ 32A-4-3(F).  Whoever receives a report

> shall take immediate steps to ensure prompt investigation of the
> report.  The investigation shall ensure that immediate steps are
> taken to protect the health or welfare of the alleged abused or
> neglected child, as well as that of any other child under the same
> care who may be in danger of abuse or neglect.

*Id.,* § 32A-4-3(C); *see also id.,* § 32A-4-4(A) (CYFD "shall conduct an investigation to

determine the best interest of the child with regard to any action to be taken.").

A police officer may hold or take a child into custody "when the officer has reasonable

grounds to believe that the child is suffering from . . . injury as a result of alleged abuse or neglect

[or that the child] is in danger from the child's surroundings and removal from those surroundings

is necessary."  *Id.,* § 32A-4-6(A)(1).  Likewise, a person in the medical profession may "hold" a

child until officers can take custody when "there are reasonable grounds to believe that the child has been injured as a result of abuse or neglect and that the child may be at risk of further injury if returned to the child's parent." *Id.,* § 32A-4-6(A)(2).

Once a child has been taken into custody, the police officer must "with all reasonable speed" either release the child to the parent with verbal counseling and warning, or deliver the child to CYFD or to a shelter facility or to a medical facility depending on the circumstances. *Id.,* §§ 32A-4-7(a)(1)-(2). Upon delivery to CYFD, "caseworkers shall review the need for placing the child in custody and shall release the child from custody unless custody is appropriate or has been ordered by the court." *Id.,* § 32A-4-7(b).

If CYFD does not release the child to the parent, the CYFD is required to "give written notice thereof as soon as possible, and in no case later than twenty-four hours, to the child's parent . . . together with a statement of the reason for taking the child into custody." *Id.,* § 32A-4-7(C). CYFD is required to make "reasonable efforts . . . to prevent or eliminate the need for removing the child from the child's home, with the paramount concern being the child's health and safety." *Id.,* § 32A-4-7(D). Nondelinquent children who are in custody are subject to placement in "specified community-based shelter-care facilities." *Id.* These include relatives who are "willing to guarantee to the court that the child will not be returned to the alleged abusive of neglectful parent . . . without the prior approval of the court," licensed foster homes, or licensed child welfare agencies. *Id.,* § 32A-4-8(A)-(D).

Unless CYFD files a petition within two days of taking a child into custody, the child is to be released to the parent. *Id.,* § 32A-4-7(D). Petitions alleging abuse or neglect cannot be filed "unless the children's court attorney has determined and endorsed upon the petition that the filing

5

of the petition is in the best interests of the child."  *Id.,* § 32A-4-15.

CYFD can also file a petition alleging abuse or neglect and seek custody of a child who is not yet in custody.  *See id.,* § 32A-4-18(A).  "[U]pon a sworn written statement of facts showing probable cause exists to believe that the child is abused or neglected and that custody . . . is necessary," the court can issue an "*ex-parte* custody order" directing "the officer to take custody of the child and deliver [her] to a place designated by the court."  *Id.,* § 32A-4-16(A), (B).  The petitioner demonstrates that custody is "necessary" by, among other things, showing "probable cause exists to believe that" the child suffers from an injury and the parent is not providing adequate care, or the "child is in immediate danger from [her] surroundings and removal form those surroundings in necessary for the child's safety," or "the child will be subject to injury by others if not placed in custody of [CYFD]."  *Id.,* §§ 32A-4-18(C)(1)-(3).

Once a child has been taken into custody, either by having an officer give custody to CYFD or by CYFD securing an *ex parte* order for temporary custody, then a custody hearing must be held within ten days from the filing of the petition with the parents having been given "reasonable notice" of the time and place of the hearing.  *Id.,* § 32A-4-18(B). The court must determine if the child should remain in or be placed in CYFD's custody.  *Id.,* § 32A-4-18(A).

## II.  Factual Background

This case turns on whether Defendants were confronted with an "emergency" when Plaintiff's children were taken into custody.  The parties point to different sets of facts to support their diametrically opposed legal conclusions.  Ultimately, what I find to be material consists of a circumscribed set of facts and those facts are not in dispute.  Nevertheless, I will examine the evidence in some detail here, in the light most favorable to Plaintiffs, to facilitate the appellate

court in the event that review of my ruling is sought.  For ease of reference, I will use short-hand

versions, rather than docket numbers, to cite to the parties' pleadings[5] and to the relevant

depositions.[6]  The key to my shorthand is set forth in the footnotes below.

### A.  February 14, 2001 – Jasmine Treated For Broken Arm

As of February 2001, Plaintiffs had two daughters – Jasmine (an eleven-month-old infant)

and Ashley (a five-year-old child).  *E.g., Garcia Mem.* at 2, ¶1.  In the early morning hours of

February 14, 2001, Jasmine's mother took Jasmine to the emergency room.  The child had a

---

[5]  The officer defendants filed a joint motion for summary judgment, *Doc. 89,* with a separate memorandum in support, *Doc. 90,* and a reply, *Doc. 105.*  I refer to their memorandum in support as "*Officers' Mem.*" and their reply as "*Officers' Reply.*"  They also filed a response to one of the social workers' motions, *see Doc. 93*, which I refer to as "*Officers' Response.*"  The two social worker defendants filed separate motions.  Ms. Garcia's filed her motion, *Doc. 84,* with a separate memorandum in support, *Doc. 85,* and a reply, *Doc. 101.*  I refer to her memorandum in support as "*Garcia Mem.*" and her reply as "*Garcia Reply.*"   Ms. Locklear's motion is her second and is joined into one document with her memorandum in support.  *Doc. 91.*  She also filed a reply.  *Doc. 106.*  I refer to her motion/memorandum as "*Locklear Mem.*" and her reply as "*Locklear Reply.*"  Plaintiffs' memoranda in opposition to each of the motions, *Docs. 98, 99, 100,* are referred to as "*Opp. to Officers,*" "*Opp. to Garcia,*" and "*Opp. to Locklear,*" respectively.  Plaintiffs' motion and memorandum for summary judgment, *Doc. 87,* is referred to as "*Plfs' Mem.*"

[6]  Duplicative excerpts from depositions are attached to the various pleadings.  I simply refer to the deposition and its page number.  For reference –  deposition excerpts identified as Plaintiff **Olivas'** appear at: *Opp. to Locklear,* Exh. 38; *Garcia Mem.,* Exh. 4; *Opp. to Garcia,* Exh. 21; *Officers' Mem.,* Exh. I.  Plaintiff **Arredondo's** at:  *Opp. to Locklear,* Exh. 34.  Defendant **Locklear's** at:  *Locklear Mem.,* Exhs. A2, A4; *Opp. to Locklear,* Exhs. 13-14; *Garcia Mem.,* Exh. 10; *Opp. to Garcia,* Exhs. 23, 33; *Officers' Mem.,* Exh. M; *Opp. to Officers,* Exhs. 26, 35-37.  Defendant **Garcia's** at:  *Plfs' Mem.,* Exhs. 5-7, 10-11; *Opp. to Locklear,* Exhs. 5-7, 10-12, 26, 36-37; *Garcia Mem.,* Exh. 3; *Opp. to Garcia,* Exhs.5-7, 10-14, 20, 25, 29, 31-32, 35; *Garcia Reply,* Exh. 4; *Officers' Mem.,* Exh. D; *Opp. to Officers,* Exhs. 5-7, 10-14, 25  Defendant **Pitts'** at:  *Plfs' Mem,* Exh. 9; *Opp. to Locklear,* Exh. 9; *Garcia Mem.,* Exh. 7; *Opp. to Garcia,* Exh. 9; *Officers' Mem.,* Exh. L; *Opp. to Officers,* Exh. 9.  Defendant **Arrey's** at:  *Plfs' Mem.,* Exhs. 1-4; *Opp. to Locklear,* Exhs. 1-4, 30, 35; *Garcia Mem.,* Exh. 6; *Officers' Response,* Exh. A; *Opp. to Garcia,* Exhs. 1-4, 30, 34; *Officers' Mem.,* Exh. E; *Opp. to Officers,* Exhs. 1-4, 30, 32-33; *Officers' Reply,* Exh. B.  **Dr. Baggs'** at:  *Locklear Mem,* Exh A6; *Opp. to Locklear,* Exhs. 20-22, 31-33; *Garcia Mem.,* Exh. 2; *Opp. to Garcia,* Exh. 19, 22; *Officers' Mem.,* Exh. C; *Opp. to Officers,* Exhs. 21-24.  **Dr. Boone's** at:  *Opp. to Locklear,* Exh. 27-29, 39; *Opp. to Garcia,* Exhs.26-28; *Officers' Mem.,* Exh. H; *Opp. to Officers,* Exhs. 27-29, 31, 34; *Officers' Reply,* Exh. A.  **Ms. Vandergriff's** at:  *Opp. to Locklear,* Exhs. 15-19, 23-25; *Garcia Mem.,* Exh. 1; *Opp. to Garcia,* Exhs. 15-18, 24; *Officers' Mem.,* Exh. B; *Opp. to Officers,* Exhs. 15-20.

broken left arm.  The record before me does not contain the emergency room records from this visit.  However, Physician Assistant Gary Boone, who attended Jasmine on this occasion, testified extensively about his observations and what he noted in his report.

Ms. Olivas explained that Jasmine fell off of a bed and injured her arm on February 12th, which made Boone suspicious because the injury did not fit that explanation.  Boone testified that infants who break a fall usually do not sustain fractures and, if they do, they fracture a wrist or an elbow.  It therefore would be unusual for a child to break an arm falling from a bed, unless perhaps it was a "bunk bed."  Moreover, infants who are swung by their arms sustain injuries to the elbow – "nursemaids elbow."  Jasmine's fracture, in contrast, was "proximally one-third down the length of the radius."  Therefore, Boone ordered a "babygram," which is an x-ray of the child "from head to toe."  That x-ray did not show any other fractures.  Although Boone remained suspicious of the cause of the broken arm, he did not make a report to CYFD or "hold" Jasmine. *See Boone Depo.* at 10-16, 30-33, 48, 50-51, 55-56.

It is not entirely clear whether Boone was also concerned about a problem with Jasmine's hip or leg during that visit.  One portion of his testimony that is in the record indicates that a radiologist read the "babygram" as "bilateral, hips and pelvis" or "frog leg" babygram. *Id.* at 31-32.

That same day, Jasmine's treating physician, Dr. William Baggs, examined Jasmine, and he also noted that the "mother's history of the injury is slightly confusing."  His notes reflect that she "states that the child was merely trying to crawl around, had the arm buckle and had pain and then seen in the ER . . . X-rays show a clearly discernable fracture of the radius and perhaps a buckle fracture of the ulna." *Locklear Mem.* at 3, ¶¶6(c); *id.,* Exh. B.  Although the mother's

explanation of the cause of the injury was a "red flag," Dr. Baggs likewise did not make any

report to CYFD or "hold" Jasmine at that point.  He testified that often "if a child falls and is

unattended, the history that I was given at that time could be appropriate."  *Baggs' Depo.* at 6-8,

14-15*; see also Opp. to Locklear* at 9.

### B.  February 18, 2001 --  Jasmine's Second ER Visit For Hip Injury

Late in the evening on February 18th, Jasmine's parents took her to the emergency room.

This time, Jasmine was not moving her left leg and refused to put any weight on it.  The

emergency room nurse's notes reflect that

> Pt's mom asked how pt. [fractured] arm and hurt her [left] leg.
> Pt's mom told several different versions of how injuries occurred
> and changed days several times.  Pt's mom first stated baby fell
> while crawling on 2/14/01; pt's mom then stated pt. fell off a bed
> on 2/12/01 [without complaining of] pain until 2/13/01 when she
> [complained of] wrist & hand pain . . .  [As for leg problem] pt's
> mom denies any fall or injury today.  Mom first stated she was with
> the baby all day, then changed and stated grandfather had kept the
> baby and noticed she was not putting her [left] leg down.

*Locklear Mem.,* Exh. C at 2.

X-rays taken that night showed an "abnormality," "possible [fracture]" of Jasmine's leg.

Nurse practitioner Joann Vandergriff who also attended Jasmine, was to consult with Dr. Baggs

and Dr. Nunn in the morning concerning the x-rays.  According to the emergency room notes,

Vandergriff was also was "to contact social services C. Plotner in  AM."

Vandergriff testified that she was "significantly" concerned for Jasmine's safety and

welfare because of confusion over who served as the primary caretaker for Jasmine and who was

claiming to be Jasmine's mother.  It appeared to her that the consent to treatment forms from the

14th and the 18th were signed by different people – "Marisela Olivas" and "Juantita Arredondo" –

and yet a "Christina Pizarro" was listed as a guarantor/emergency address.  Vandergriff also

found the explanations given for the injuries at this visit and the prior visit were conflicting.

*Vandergriff Depo,* at 18-25.

Despite these concerns, Vandergriff testified that no one contacted CYFD or "held"

Jasmine that night.  Emergency room personnel "let the child go home, so obviously we didn't

feel that [she] was going to be further harmed."  *Id.* at 34.  Jasmine was treated with medication

and discharged to her parents, who were told that Drs. Nunn and Baggs would contact them the

next morning further care and evaluation.  *Id.* at 1-2; *see also Vandergriff Depo.* at 4, 12.

### C.  February 19, 2001 -- First Reports Of Suspected Abuse Of Jasmine

Vandergriff waited to telephone CYFD to make a report until the next morning, evidently

after consulting Dr. Nunn's opinion about Jasmine's x-rays.  *Id.* at 34-40.  According to the

"APS/CPS Intake Report," a "nurse practitioner" called just before noon and reported:

> concerns of possible PA of child, Jasmine Arredondo (approx. 11
> months) by mother/caregiver, Christina Pizarro.
>
> Source reports that on 2/14/00 (sic), child was brought to hospital
> ER at 3:00 AM.  Caregiver (believed to be Christina Pizarro) stated
> that child was having difficulty crawling due to fact that child was
> not using left arm.  X-rays revealed that child had sustained a
> fracture to left radius.  A complete set of x-rays ware done to see if
> there were any other fractures (old or new) . . . none wore found.
> At that time, mother denied any injury of (sic) abuse.
>
> Last night, child was again brought to ER by Christine (sic) Pizarro.
> She stated that baby was not standing on or moving left leg.
> Mother indicated that prior to the 2/14/00 (sic) visit, child had
> fallen from bed (this contradicts mother's original story when she
> denied any injury to child).  X-rays were done, and there was a
> question regarding left hip.  This morning, radiologist reviewed  X-
> ray again and found hip to be normal; however, child cried each
> time leg was moved.

10

> Source is suspecting possible PA and/or PN of child primarily due
> to fact that mother/caregiver has given conflicting stories.  Source
> also states some confusion as to who is the child's actual
> mother/caregiver, as records also give name of a Marisela Olivas as
> possible caregiver.

*Officers' Mem,* Exh. A.

Meanwhile, also the morning of February 19th, Dr. Baggs reviewed the x-rays from the

previous night and examined Jasmine.  His notes state:

> Patient is seen back with questions of problems to her left leg.
> Mom said this occurred at the same time.  She was limping so they
> took her to the ER and some fuzziness was seen on the left lesser
> trochanter and she was referred back here.  Indeed, this child is
> protective of the leg and the x-rays were reviewed and I do see the
> periosteal reaction consistent with a healing injury.  ***At the current
> time, with two injuries in this 11 month old raises the question of
> child abuse.  Would get Protective Services in to see this child
> and talk to the parent and also get a bone scan to rule out any
> other unidentified injuries.***

*Locklear Mem.,* Exh. B (emphasis added).  Dr. Baggs returned Jasmine to her parents after his

examination, but he also instructed his staff to contact CYFD to report the suspected abuse.

*Baggs' Depo.* at 9-12.

That afternoon, a "clinical assistant" from his office telephoned CYFD at approximately

1:40 in the afternoon to make the report.  According to the CYFD Running Narrative Document:

> Source reports that several days ago, mother brought child to Dr.
> Baggs' office due to fact that child had a fractured left arm.  This
> morning, child was again brought to office.  According to source,
> child has a fractured femur of left thigh.  Mother says that she
> believes fracture to arm and leg occurred on the same day; she
> states that injury must have occurred when child was crawling
> around on the floor and fell onto her right side.  According to
> source, child is scheduled for a bone scan at Carlsbad Medical
> Center within next few days.

11

> Source states that physician is concerned that there is [physical
> abuse] of child, as fracture are no[t] consistent with mother's story.

*Officers' Mem.,* Exh. A.  Thus, CYFD records indicate that by 11:23 a.m. on February 19th it

received the first report and "opened" a case.  By 1:40 p.m. that afternoon, it received the second

report, which was memorialized and added to the other case by 2:41 p.m.  *Id.; see also Garcia*

*Reply,* Exh. 1.

### D.  CYFD Investigation Efforts - February 19th

None of the pleadings before me clearly set forth how CYFD handles assigning reports for

investigation generally, or how it handled this particular situation after the reports were received.

It is undisputed that in this case, the matter was given the designation "P-1" which means "we

have twenty-four hours to respond. . . ."  *Locklear Depo.* at 151; *see also Garcia Depo.* at 140.

My review of the deposition testimony reveals that social worker Naomi Locklear was

assigned overall responsibility for the case on February 19th.  However, social worker Rebecca

Garcia was to take responsibility for initiating action on the case because Locklear apparently was

either out of the office that day or did not see the referral until either the following evening or the

day after.  There was testimony that Locklear's office was short-staffed at that time.  *See*

*Locklear Depo.* at 32, 130-34, 150; *see also Garcia Depo.* at 53-54, 119-20.

### E.  Investigation Efforts on February 20th

Although Garcia was aware of the case as of February 19th, she was not asked to start

investigating until the next day, just as the twenty-four deadline to provide notice was due to

expire, assuming Vandergriff's 11:23 a.m. phone call triggered the time period.  *See Garcia*

*Depo.* at 32, 53-54, 119-20, 138.  According to Detective Rudy Arrey's notes, Garcia contacted

him at 10:30 a.m. on February 20th, saying she received a report of abuse that they needed to investigate.  They agreed to meet at 1:00 that afternoon.  *See Officers' Mem.,* Exh. F; *Arrey Depo.* at 30-31.

Garcia and Detective Arrey first met at the CYFD offices, where Garcia briefed him on the two reports.  *See Officers' Mem.,* Exh. F; *Arrey Depo.* at 74-75.  They then went to the hospital and Vandergriff was not at the hospital at that time.  They spoke with physician assistant Boone.  *See Garcia Depo.* at 32, 34-35; *Arrey Depo.* at 24-28.  Boone does not recall having this conversation with Garcia and Arrey, but does not deny that it could have taken place.[7]  Furthermore, the information Garcia and Arrey reportedly received from Boone is for the most part consistent with his testimony about his impressions and concerns about Jasmine on the 14th:

> I asked P.A. Boone if he remembered the (sic) Jasmine and he said he did.  I asked him about the injuries he told me that he was concerned about the injury to her left radial bone.  P.A. Boone said that the break in the bone was near the elbow at a right angle across the bone, which was inconsistent to a child falling off the bed as the mother had told him.  P.A. Boone said that he was concerned because the break was consistent with a hard grab or a pulling of the arm.  P.A. Boone said that he noticed that Jasmine's left hip [and] upper thigh was also tender so he had the X-ray Tech. do a full body scan, but no injury could be found around the left hip or upper thigh.

*Officers' Mem.,* Exh. F.; *see also id.,* Exh. G (Boone related that if Jasmine "had fallen and tried to catch herself she would have more than likely broken both bones in her arm."); Arrey Depo. at 75 (Boone indicated the radial fracture was as a result of a "torquing motion").

_____

[7]  *Boone Depo.* at 21 (Boone stating that he does not recall meeting Arrey on the 20th and has never worked with Garcia); *id.* at 30 (after seeing Arrey's and Garcia's documentation of the conversation Boone testifies that he does not recall the conversation but is not denying that it could have taken place); *id.* at 57 ("Q: . . . I just want to make sure that you do not dispute that you spoke with Detective Arrey and Rebecca Garcia, correct?  A [Boone].  I suppose I must have.  They made note of it.  I don't recall it.").

There is no evidence that Garcia or Detective Arrey made any further attempt to contact Vandergriff or Dr. Baggs or any other nurse or assistant or doctor who attended Jasmine. Instead, they went straight to where Plaintiffs' and their children were residing, which was in one bedroom in the home of Ms. Olivas' in-laws.  *See Officers' Mem., Exhs. F, G; Arrey Depo.* at 35-36, 71-76; *Garcia Depo.* at 32, 121; *Olivas Depo.* at 40-41.

### F.  Decisions Regarding The Children On Afternoon of February20[th]

When Arrey and Garcia arrived at the home where Plaintiffs were living, initially Ms. Olivas declined to speak to them because "of her probation" and because her probation officer "told her not to talk to any officers."  *Officers' Mem.,* Exh. G; *see also Olivas Depo.* at 36-37. Arrey called the probation officer, who advised him that Ms. Olivas was mistaken.  *Officers' Mem.,* Exh. F; *see also Olivas Depo.* at 36-37.  The probation officer the "spoke briefly to Marisela advising her to speak to [them]."  *Officers' Mem.,* Exh. G; *see also Olivas Depo.* at 36-37.  Garcia reported that Ms. Olivas then told them that she had been charged with "fraud" concerning counterfeit money.  *Officers' Mem.,* Exh. G; *see also id.,* Exh. K; *United States v. Olivas,* CR 98-984 BB.[8]

Arrey and Garcia explained that they were investigating the reports by Vandergriff and Dr. Baggs.  *See Officers' Mem,* Exhs. F, G; *Olivas Depo.* at 36, 38-39.  They were permitted to view the bed from which Jasmine had allegedly fallen, which was a standard box spring and mattress on frame rails "2 ½ to 3 feet off the floor [and] the floor was carpeted with a thick maroon carpet."

---

[8]  Ms. Olivas was indicted in this district in December 1998.  After granting several defense motions to continue the trial, a jury convicted her on June 8, 1999.  She became pregnant around the time of her trial and was sentenced August 31, 1999.  By an order dated October 26, 1999, her voluntary surrender date was extended to May 26, 2000 so that she could complete the pregnancy and recuperate for two months.  *See United States v. Olivas,* CR 98-984 BB (*Docs.* 1, 8, 9, 11-13, 15, 27, 28, 34, 36, 37).

*Officers' Mem.,* Exh. F; *see also id.,* Exh. G ("the floor was carpeted and the bed was not high off of the ground").  They also interviewed Ms. Olivas, who again explained that Jasmine fell from the bed.  *See id.,* Exhs. F, G; *Olivas Depo.* at 38.

They spoke with Ashley, but whether they did so separately or together is unclear.  *See Olivas Depo.* at 40; *Garcia Depo.* at 37, 39; *Officers' Mem.,* Exh. F.  According to Arrey, Ashley "told us that ***she*** had fallen off the bed and she also said that Jasmine had fallen of[f] a swing and a chair." *Officers' Mem.,* Exh. F (emphasis added).  The submissions do not clarify whether the "she" who fell off the bed refers to Ashley or Jasmine.  Garcia did not report that Ashley made this comment.  According to her, Ashley was appropriately dressed, not malnourished or fearful of her care-givers, and did not "disclose any abuse." *Garcia Depo.* at 39, 40; *see also id.* at 43.

The next sequence of events is somewhat muddled.  Arrey testified that he made the decision to "remove" and "take custody" of both Jasmine and Ashley.  He further testified that before he and Garcia spoke with Ashley, he informed Ms. Olivas that he was going to take both. *See Arrey Depo.* at 62, 85-86, 89-91.  The record portions of Ms. Olivas' deposition testimony only indicate that Arrey told her he was going to take Jasmine.  *Olivas Depo.* at 40.  The page containing her answer to the question, "What else did he say?" was not furnished.  *Id.* at 41.

Arrey decided to take custody of Jasmine because he believed there was "ongoing abuse" based on his earlier discussion with Boone concerning Jasmine's two "broken bones" within one week.  Arrey likewise believed the proffered explanation for the injuries inconsistent with his observations of the subject bed.  *See id.* at 66, 71-72, 75-67, 78. 81-83.

Both social workers testified that it is their understanding that CYFD employees who are investigating reports of suspected abuse cannot themselves remove or take custody of children.

15

Instead, only a police officer can make the decision to remove a child from their parents and give

temporary custody of the child to CYFD, and the officer's decision to remove and transfer such

custody is final.  Thus, if the officer gives custody of a child to CYFD that the social workers

think should not be removed from the parents, they nonetheless must take custody of the child.[9]

*See Locklear Depo.* at 134-36, 151; *Garcia Depo.* at 43, 50, 81-83. In this case, Arrey gave

"custody" of Jasmine to CYFD through Garcia, who concurred with his decision and "accepted"

custody.  *Arrey Depo.* at 70, 76.

Arrey also decided to take custody of Ashley due to his training for such situations:

> Q.  What basis was there for taking custody of the older child?
>
> A.  Well, through my experience and training, that training class
> that I went to through CYFD, it – it was taught to us that if one of
> the children is in harm, then when it's taken out of the home, then
> the abuse goes to the other child or children, so it's best to – if
> there is a – you know, possibility of abuse of one child, you know,
> it's common practice that all the children have to be taken.

*Id.* at 63-64.  Thus, it was Detective Arrey's understanding that siblings of a removed child

themselves were potentially at risk for abuse and that the "standard operating procedure" called

for removal of siblings as well.  *See id.* at 73, 76, 84-85.  His supervisor understood the same:

> A:  . . . it is common practice when we remove one child for abuse
> allegations for us to remove all the children for the protection of
> that child.
> Q:  Is that standard practice?
> A:  That's fairly standard practice.  Not done in every case, but
> fairly standard.
> Q:  Is that a written practice?
> A:  Not that I am aware of.

---

[9]   On the other hand, if an officer refuses to remove and give custody of a child who the social
workers think should be removed, the social workers' only recourse is to petition a judge for an *ex parte*
order of temporary custody.

* * * * *

> Q:  You would agree with me that there was no emergency relating
> to Ashley Arredondo, would you not?
> A:  I would not agree with that statement.
> Q:  You think there was an emergency?
> A:  I think that any time that you have injuries that are consistent
> with the ones that Detective Arrey was aware of regarding Jasmine
> and you – we are in the early stages of the investigation, and you do
> not know exactly what is going on in the household until you can
> further investigate, that we have a duty as police officers to protect
> those children and pull them out if there was the slightest potential
> for them to be abused.

*Pitts Depo.* at  25, 28.

Although Arrey had decided take custody of Ashley, Garcia "refused" to accept her
because she did not believe Ashley was in any danger.  *Arrey Depo.* at 67, 76, 87, 90-91.  Arrey
felt strongly about also taking Ashley, however, so he and Garcia "went back and forth" on the
subject.  He felt that Jasmine's injuries indicated a potential danger to Ashley as well.  *Id.* at 86-
87, 90-91.  Arrey understood that if he took custody of Ashley, CYFD was required to accept
her, and this was the first time he had been faced with a CYFD refusal of custody.  *Id.* at 64-65,
87-88.  He did not remove Ashley on his own accord over Garcia's protests, because he did not
think he could do so – "all the law allows me to do is place them with CYFD or the parents, and
anything other than that I'm not allowed to do."  *Id.* at 68.

Arrey testified that he did not "want to make [it] look like [Garcia] was refusing custody."
*Id.* at 64-65.  Nevertheless, he was concerned for Ashley's safety and felt strongly about removing
her.  *Id.* at 65, 68-70, 87-88.  He therefore opted to simply mention in his written report, *id.* at
64-65, 90, that "I asked Garcia if we needed to pick up the five year old as well and she said no."
*Officers' Mem.,* Exh. F.  That same afternoon, however, he also reported the situation to his

supervisors, who he says agreed with him and themselves contacted CYFD in an effort to "take care of it." *Id.* at 70, 87-88; *see also Pitts Depo.* at 27-28 (Detective Arrey indicated his concern that if Ashley was left with her parents, she also would be abused).

Garcia's testimony is in accord with Detective Arrey's insofar as they disagreed on whether Ashley was in danger if left with her parents. Garcia believed that removal was not warranted because Ashley did not "disclose/report" any abuse and thus was "safe." However, Garcia testified that as a result of their discussions, she thought Arrey was in agreement with her, and that he therefore decided not to take custody of Ashley that day. *E.g., Garcia Depo.* at 40, 42-43, 58. Garcia further testified that she did not believe an emergency existed on February 20th and no reason why a court order could not have been obtained. *Id.* at 90, 140. It is unclear, however, whether she was referring to the situation regarding both children or just Ashley.

Although Garcia agreed with the decision to "remove" Jasmine, *see, e.g., id.* at 40, 59, 83-84, 138, her testimony is contradictory as to whether CYFD had "custody" of Jasmine on the afternoon of February 20th. She testified that because they reached an agreement for Jasmine to stay with Ms. Duenez (Ms. Olivas' sister), "the state wasn't getting custody." *Id.* at 43, *see also id.* at 46 ("As an alternative to the state being given custody, we talked about there being a relative that the little girl could stay with while we were doing our investigation."); *see id.* at 51. Yet, in response to the question that "you told the parents [on the 20th] that the child could not remain in their home, correct?," she responded, "[w]e would have ended up with custody at this point." *Id.* at 47.

Ms. Olivas was upset and angry because "they were falsely accusing me of something that was not true." *Olivas Depo.* at 41. Arrey reported Ms. Olivas' belief that Jasmine had received

negligent care from the medical personnel and that they and the police "had conspired against her. . . ." *Officers' Mem.,* Exh. F; *see also Arrey Depo.* at 45; *Officers' Mem.,* Exh. G.  Indeed, later that afternoon at CYFD, Mr. Arredondo, Ms. Olivas, and Ms. Duenez all were "upset and angry, and they were of the opinion that there was no abuse or neglect, that this could not have possibly happened." *Garcia Depo.* at 52.  They

> were all focused on the medical care that the baby received and the conflicting stories that they were hearing.  [Garcia] [t]old them that they needed to focus on the injuries that the baby had received. . . . [Ms. Olivas] stated that the hospital should have noticed the broken leg, if there is a break, because she hadn't been handling the leg carefully and feels that she may have hurt it is was already hurt because she didn't[] know it was hurt.  [Garcia] [a]gain told them that everyone was aware of the broken arm and the story they were giving is not consistent with the injury this infant has.  [Mr. Arredondo, Ms. Olivas, and sister] remained very focused on medical issues instead of their infants (sic) injuries.

*Officers' Mem.,* Exh. G.  Thus, even Ms. Duenez, the sister with whom Jasmine was placed overnight, "felt that the parents were being punished instead of the hospital."  *Id.*

### G.  Decisions Regarding Removal of Children Made February 21st

The next morning, Locklear spoke with Dr. Baggs.  He explained that he had seen Jasmine on the two occasions, and that she had

> presented with a fractured forearm on the first visit and the second with callous around the hip area which he describes as "suspicious for a healing fracture" and possibly present for 1 or 2 weeks.  Dr. Baggs stated that he has concern about the child, particularly the leg injury.  He described a child's bones at Jasmine's age as being very rubbery and difficult to break them.  He said the leg injury was "a red flag."  He stated that the mother was "relatively appropriate" but that he'd "been fooled flat out before."  He stated that they attempted to do a bone scan on the child but could not locate a vein to inject the dye."'

*Locklear Mem.,* Exh. A-1; *see also Locklear Depo.* at 23, 76; *Locklear Mem.,* Exh. A, ¶¶6-9

(hereinafter "*Locklear Aff.*").[10]  Locklear also spoke with Ms. Olivas.  *Locklear Mem.,* Exh. A-1.

She further had access to the Vandergriff and Baggs reports, as well as what Boone had told

Garcia.  *Locklear Depo.* at 122-23; 131-34.[11]  At some point, she apparently also spoke with the

sister who was keeping Jasmine.  *See Locklear Aff,* ¶17.b.

Locklear disagreed with Garcia's decisions to not accept custody of Ashley and to place

Jasmine with Ms. Olivas' sister.

> I would have done things differently.  I would not have denied
> custody of the children. . . .  When the police officer said to Ms.
> Garcia, you know, "I want to give you emergency custody of these
> kids," I would have said, "Good call."
>
> * * *
>
>  I would have explored a different relative.  I mean there is no
> reason on the 21st those kids couldn't have gone to Ruby and Rafael
> Olivas's [another relative's] house.  They were already a licensed
> foster parent house.  They both could have gone there.

*Locklear Depo.* at 134-35, 137.

---

[10]  The affidavit attached in support of Locklear's motion is dated February 4, 2005, which is after her November 2004 deposition.  However, it does not contradict the portions of her deposition testimony that I have before me, which do not provide a complete overview of the relevant facts. Plaintiffs have not moved to strike the affidavit, nor do I find that Defendant Locklear is attempting to create a "sham" issue of fact with this supplementary affidavit.  *See, e.g., Locklear Depo.* at 23, 68-69, 122; *Locklear Mem.* at II, ¶¶3, 5, 6-9, 13, 15-18; *Opp. to Locklear,* III, ¶¶ C, E, F- I, M, O- R; *Locklear Reply* at 2-10; *see also e.g., Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003, 1016 (10th Cir. 2002); *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986).

[11]  Locklear also states that she knew, through a conversation with Arrey, that both Mr. Arredondo and Ms. Olivas had criminal records.  The placement of this notation in her affidavit makes it appear that she had that information before the staff meeting where CYFD concluded that it should try to take emergency custody of both children if the police were willing to do so.  *Locklear Aff,* ¶¶12, 16; *see also Officers' Mem.,* Exh. K.  Her report, however, indicates that she did not talk with Arrey until after the meeting concluded, when she called to inquire whether the police would be willing to take custody. *Locklear Mem,* Exh. A-1.

20

A CYFD staff meeting took place involving Locklear, Garcia, their supervisor, and a CYFD attorney. *See Locklear Aff.,* ¶13. The two "overriding concerns" were that Jasmine and Ashley were in "immediate danger of harm." *Id.,* ¶ 14. The concern for Jasmine stemmed from placing her with Ms. Olivas' sister. "Although it is preferable to place children with family members if possible, in this case, [the sister] expressed to both [Locklear] and Ms. Garcia that she did not believe that abuse had occurred and we were, therefore, skeptical of her willingness to prevent the children's parents from visiting." *Id.,* ¶17.c.; *see also id.,* ¶14; *Locklear Depo.* at 137; *Locklear Mem.,* Exh. A-1 (Garcia entry dated 2/22/01 at 12:11 p.m.).

The concern for Ashley stemmed from the suspicion that Jasmine had been abused and had been removed, thereby making it "likely" that Ashley would "be targeted for abuse." *Locklear Aff.,* ¶18; *see also id.,* ¶ 14. Based on her training and experience, Locklear testified that a "targeted child" is

> like a scapegoat, that sometimes in families for whatever reason a family targets one child and that child is – gets the brunt of the abuse. And I mean we have all heard that. That's very common. It happens in a lot of families.
>
> So one of the things that we had discussed was the idea that Jasmine probably being the most, you know, needy, the most demanding, she probably was crying a lot, I mean obviously she's in pain, you know, so they probably weren't sleeping. All those things. But if she was taken out of the home and Ashley hadn't been the targeted child, then Ashley could then become the scapegoat because there was no one else in the home for them to abuse – a parent to abuse.

*Locklear Depo.* at 124.

Employing structured decision making ("SDM"), a CYFD tool to determine the level of risk involved with the children, the meeting concluded with the decision that both children should

be removed immediately because they were at serious risk for harm.  *Locklear Aff.,* ¶15; *see also id.,* ¶¶ 17-19.  Garcia apparently disagreed, since she also testified that she did not believe there was an emergency on the 21st or any reason why a court order could not have been obtained, and her report of the staff meeting does not indicate that she necessarily shared the same conclusion. *Garcia Depo.* at 90, 140; *see also Locklear Mem.,* Exh. A-1 (Garcia entry dated 2/22/01 at 12:11 p.m. – "was decided that").

### H.  Custody & Subsequent Proceedings

Because Arrey was going to be out of town, he had briefed his supervisor Administrative Sargent Mike Pitts on the situation, and it was Pitts who accompanied Garcia to Ashley's school to retrieve her in the early afternoon.  Ms. Olivas was there when they arrived, and Pitts executed and gave her a "Statement of Reasonable Grounds" form.  That form indicated that he was placing Jasmine and Ashley into the custody of CYFD because he had "reasonable grounds to believe that [they were] suffering from an illness or injury as the result of alleged abuse or neglect [and/or] in danger from [their] surroundings."  *Opp. to Locklear,* Exh. 8; *see also Pitts Depo.* at 15-17, 22-26, 30-33.  Garcia executed and delivered a corresponding "Notice to Parents of Physical Custody" form, which informed the parents that: (1) if CYFD did not file a petition by February 23rd, their children would be released; and (2) if the parents were named as respondents in an abuse proceeding, they had a right to an attorney at no cost to themselves.  *Officers' Mem,* Exh. Q.

On February 23rd, a state district judge issued an *ex parte* custody order finding probable cause to believe the children were abused or neglected, and that it was in their best interests for them to remain in CYFD custody for their protection.  *Locklear Mem.,* Exh. A-5; *see also*

*Locklear Aff.,* ¶¶ 20-21; *Locklear Mem.,* II., ¶¶ 18-19; *Opp. to Locklear,* III., ¶¶ R-S.  On March 1ˢᵗ, the court held a custody hearing, which the parents attended with their attorney.  Again the judge found probable cause to believe the children would be subject to injury if not left in the custody of CYFD.  *Id.,* Exh. D; *see also Locklear Aff.,* ¶ 22; *Locklear Mem.,* II., ¶ 20; *Opp. to Locklear,* III, ¶ T.

Less than two weeks later, Dr. Baggs notified CYFD that he had mistakenly diagnosed Jasmine's hip condition as a fracture when in fact she had an infection resulting in a "septic hip."  At that point Dr. Baggs was concerned about potential malpractice litigation, and he relayed his belief that with this new information, he had no concerns regarding suspected child abuse or neglect.  *Locklear Aff., ¶ 24.*  Yet another physician who is an expert in child abuse cautioned against release, however.  Dr. Karen  Campbell remained concerned about both of the children's safety because of the lack of a consistent explanation for Jasmine's arm injury.  *Id.* at ¶ 23.  Evidently deciding that they could not pursue the case without the support of the treating physician, the case was dismissed and children returned to the parents on March 21, 2001.  *Officers' Mem.,* Exh. A.

# III. Analysis

### A. Overview Of Summary Judgment Standard
### In The Qualified Immunity Context

If a defendant raises qualified immunity as the basis for summary judgment, a different analytical framework applies. The burden shifts to the ***plaintiff*** to show two things: (1) a violation of a constitutional right, and (2) that the violated right was clearly established as of the date of the offending conduct. The analysis is based on Plaintiffs' allegations and conducted in sequential order. *See, e.g., Brosseau v. Haugen,* ___ U.S. ___, 125 S. Ct. 596, 598 & n.3 (2004) (*per curiam*); *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001); *Mimics, Inc. v. Village of Angel Fire,* 394 F.3d 836, 841 (10th Cir. 2005); *Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1239 (10th Cir. 2003). Given the purposes underlying qualified immunity, Plaintiffs' burden is "heavy," notwithstanding the obligation to view the evidence in the light most favorable to them. *E.g., Gross v. Pirtle,* 245 F.3d 1151, 1155 (10th Cir. 2001).[12]

If a plaintiff meets his or her burden on both questions, usually the qualified immunity

---

[12]   A recent Tenth Circuit decision involving a case from this district explained:

> Once a defendant raises a defense of qualified immunity, "the burden shifts to the plaintiff [to] satisf[y] a heavy two-part burden." [quoting *Gross*] . . . Mr. Moore argues that the district court was required to accept as true his version of the facts. While it is true, as the district court recognized, that the court may not resolve disputed facts on summary judgment, it is not required to accept the non-movant's self-serving and conclusory assertions. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002). ***Moreover, "[a]lthough we are required to view the evidence in the light most favorable to the nonmoving party, we must not refrain from examining the evidence altogether."*** *Heartsprings, Inc. v. Heartspring, Inc.,* 143 F.3d 550, 557 (10th Cir. 1998).

*Moore v. Hernandez,* 2005 WL 758788 at *2 (10th Cir. 2005) (emphasis added).

defense will fail.  Nevertheless, a defendant may still avoid trial and liability by showing

"exceptional circumstances" that render his or her "conduct objectively reasonable" under the

circumstances.  *E.g., Mimics,* 394 F.3d at 842 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 819

(1982) and *Roska,* 328 F.3d at 1251, and mentioning factors such as reliance on state statutes and

advice of counsel).  I conclude that Plaintiffs fail to meet their burden on either prong.

### B.  Summary of the Arguments

The parties' arguments boil down to this:  Plaintiffs contend that there was no emergency

justifying the taking of the children.  They argue that none of the medical professionals themselves

saw fit to hold the children until CYFD and the police could be contacted.  CYFD coded the

matter "P-1" giving a 24 hour time period for investigation.  The CYFD employee on the scene,

Garcia, was of the opinion there was never an emergency.  Moreover, Garcia also believed that

CYFD had ample time to obtain a custody order from the court.  Plaintiffs contend that CYFD

made no attempt to do so as the agency rarely obtained court orders.  *See, e.g., Plfs' Mem.* at 7-

8; *Opp. to Officers* at 14-15, 17-18; *Opp. to Garcia* at 17, 20-22; *Opp. to Locklear* at 18-19.

Defendants counter that they confronted an emergency situation:  an infant who had

suffered two painful injuries within a week's time, for which there was no consistent explanation,

and which sufficiently alarmed medical professionals and the infant's own treating doctor to

report the situation.  They maintain that these circumstances justify the taking the infant and any

other sibling from the parents on an "emergency basis" pending further investigation, regardless of

whether there is sufficient time to secure a warrant.  *See, e.g., Garcia Mem.* at 11-12; *Garcia

Reply* at 5-7; *Locklear Mem.* at 13-19; *Locklear Reply* at 14; *Officers' Mem.* at 10-15; *Officers'

Reply* at 8-9.

25

### B.  *Roska Does Not Require Seeking An Ex Parte Order Granting Custody If Emergency Circumstances Exist*

All parties rely on the Tenth Circuit decision in *Roska ex rel. Roska v. Peterson,* 328 F.3d 1230 (10th Cir. 2003).  *Roska* held that as of 1999, well before the incidents at issue here took place, a reasonable officer would know that it would be unlawful to deprive a parent of a child in absent pre-deprivation process unless emergency circumstances "pose an immediate threat to the safety of a child. . . ."  *Id.* at 1250, quoting *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997).  The Tenth Circuit cautioned that "[a]s the Second Circuit has noted, the 'mere possibility' of danger is not enough to justify a removal without appropriate process."  *Roska,* 328 F.3d at 1245, quoting *Tenenbaum v. Williams*, 193 F.3d 581, 594 (2nd Cir. 1999).

Twice in its analysis, the *Roska* court commented that the defendants "did not even attempt to obtain an *ex parte* order."  *Id.* at 1246, 1250.  Given those comments and *Roska's* citation to *Tenenbaum* and that time to secure a warrant is at issue here, I believe I must first clarify whether, as a matter of constitutional law, *Roska* imposes a requirement that officials obtain an *ex parte* order for custody whenever there is time to do so.  I find that it does not.

Nowhere does *Roska* expressly hold that an *ex parte* order is required as a matter of constitutional law.  Rather, it identifies the applicable constitutional standards which provide that children may be removed from their parents without a prior hearing where "emergency" or "exigent" or "extraordinary" circumstances exist.[13]   In the child abuse removal context,

---

[13] *Roska,* as well as other Tenth Circuit decisions hold that an "'immediate threat to the safety of the child'" will suffice.  *See Roska,* 328 F.3d at 1250 (quoting *Malik,* 191 F.3d at 1305); *see also id.* at n.24; *Hollingsworth,* 110 F.3d at 739; *Snell v. Tunnell,* 920 F.2d 673, 697 (10th Cir. 1990), *cert. denied sub nom. Sweptson v. Snell,* 499 U.S. 976 (1991); *Chavez,* 130 N.M. at 760-61, 31 P.3d at 1034-36 (applying federal law).

26

"exigency," "emergency," "imminent," or "immediate" are synonymous. *See Doe v. Kearney,* 329 F.3d 1286, 1295, n.10 (11th Cir.), *cert. denied sub nom. Doe v. Reiger,* 540 U.S. 947 (2003). And, in the qualified immunity context, whether an "emergency" exists is a question of law to be decided by the Court. *E.g., Roska,* 328 F.3d at 1240, 1245-46, 1250; *Malik,* 191 F.3d at 1315 & n. 5; *Snell v. Tunnell,* 920 F.2d 673, 696-97 (10th Cir. 1990), *cert. denied sub nom. Sweptson v. Snell,* 499 U.S. 976 (1991); *Taylor v. Evans,* 72 F. Supp. 2d 298, 307 (S.D.N.Y. 1999).

As previously noted, *Roska* relied on *Tenenbaum* for the proposition that a mere possibility of danger will not suffice.   That portion of the *Tenenbaum* decision further provides that if a mere possibility of danger was enough to deny pre-deprivation process:

> officers would always be justified in seizing a child without a court order whenever there was suspicion that the child might have been abused. . . .  The law thus seeks to strike a balance among the rights and interests of parents, children, and the State. . . .
>
> * * * * *
>
> While there is a sufficient emergency to warrant officials' taking [a child into] custody without a prior hearing if [he or she] is immediately threatened with harm . . . the converse is also true.  If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent; there is no reason to excuse the absence of the judiciary's participation in depriving the parents of the care, custody and management of their child.  If, irrespective of  whether there is time to obtain a court order, all interventions are effected on an "emergency" basis without judicial process, pre-seizure procedural due process for the parents and their child evaporates.

*Id.* at 594-95 (internal quotations and citations omitted).

Thus, *Tenenbaum* announced a new rule of constitutional dimension in 1999, and it noted that it was changing the law:

> Because we now hold that it is unconstitutional for state officials to
> effect a child's removal on an "emergency" basis where there is
> reasonable time safely to obtain judicial authorization consistent
> with the child's safety, caseworkers can no longer claim, as did the
> defendants here, that they are immune from liability for such actions
> because the law is not "clearly established."

*Id.* at 596.  Indeed, the applicable New York statute explicitly required "in order to effect an

emergency removal without a court order, there must not be enough time to apply for such a

court order."  *Id.* at 587, n.2.

The Second Circuit was plainly concerned with a situation where the child welfare agency

routinely and as a matter of policy acted on an "'emergency' basis rather than seek[ing] parental

consent or a court order" and without consulting "legal counsel."  *Id.* at 591.  It was concerned

that "if officers of the State come to believe that they can never be questioned in a court of law

for the manner in which they remove a child . . . it is inevitable that they will eventually inflict

harm on the parents, the State, *and* the child."  *Id.* at 595 (emphasis original).[14]

If *Roska* were likewise changing the law in the Tenth Circuit by engrafting the requirement

of a warrant if time permits, I believe the decision would have said so.  It did not.  Rather, in the

section discussing whether the law was clearly established, the *Roska* court cited its own decisions

in *Malik* and *Hollingsworth* as establishing the law, neither of which hold that due process

requires securing a warrant if time permits.  *See* 328 F.3d at 1250; *see also Malik,* 191 F.3d at

1315 & n. 5; *Hollingsworth,* 110 F.3d at 739.  Thus, I do not read *Roska* as changing prior well-

---

[14]  *See also id.* at 609 (Jacobs, Circuit Judge, concurring and dissenting in part) ("The error of the
majority opinion is partly traceable to the City's admission that it routinely effects emergency removals and
rarely seeks judicial pre-authorization.  Such a policy might be called into question in a case in which no
objective emergency exist.  But this is not such a case . . .  The majority opinion . . . treats the City's policy
as circumstantial evidence from which a jury could infer a lack of emergency").

established law that when an emergency exists, the constitutional requirement of a warrant is

eliminated and/or notice an opportunity to be heard is postponed.  *See e.g., Roska,* at 1240-41,

1245, 1249; *Hollingsworth,* 110 F.3d at 739 (and cases cited therein); *Brokaw v. Mercer County,*

235 F.3d 1000, 1021 (7th Cir. 2000) (and cases cited therein).

Finally, despite *Tenenbaum*'s discussion of time to secure a warrant, the key to the

decision was the Second Circuit's finding that there was no emergency justifying social workers'

decision to take a five-year old mute child from school and submit her to a gynecological

examination without parental consent or attendance  *See* 193 F.3d at 591 & 594.  *Tenenbaum*

discussed why the unique facts of that case did not amount to an emergency and, thus, why a

warrant should have been secured.[15]  The Second Circuit disagreed with the district court's

---

[15]  There, a five-year-old child was afflicted with "elective mutism" and she rarely spoke.  When she woke up crying from a nap at school, her teacher prompted her with a series of questions about whether various people were hurting her.  The child indicated 'yes" when the teacher mentioned the child's father. The teacher then used a doll to inquire where she was being hurt, and the child pointed to the groin.  The teacher did not report what she learned to the authorities that day.  The following day, a Friday, the child had drawn a picture and when the teacher inquired what the picture represented, the child said she and her "Daddy kneeling, hurt."  The teacher phoned in a report that day.  193 F.3d at 588.

The caseworker, who had received a written report from the agency operator of possible sexual abuse on a Friday, was unable to contact the teacher.  She did investigate at the parents' home that night, but left the developmentally-disabled child in the custody of her parents over the weekend, despite the availability of agency personnel working at nights and over weekends.  Moreover, at the home the caseworker did not tell the parents that he was investigating a report of sexual abuse.  She informed them that he was investigating a report that the child was developmentally-delayed and sleeping in class.  She also did not inform them that they were to call her supervisor on the following Monday.  *Id.* at 589.

Although the parents had provided the caseworker with the names of their children's physicians and signed a release on Friday, on Monday, the caseworker did not contact the doctors.  Nor did she or her supervisor recontact the parents.  She did interview the teacher and the child, who now was responding "no" to every question, including whether her father had touched and hurt her.  Upon receiving the caseworker's report, her supervisor advised her to work on other matters.  The next day, the supervisor decided to take the child to the hospital to "rule out [the possibility of] sexual abuse.  He did not consider contacting the legal department for advise or contacting the parents to ask for their consent to do so.  He considered the parents' failure to call his as indicia that they were taking allegations of sexual abuse

conclusion that an emergency existed based solely on the fact that Sarah had at one point

appeared to allege sexual abuse by her father.  Because the allegation had not yet been confirmed

or controverted, the Second Circuit found that basis insufficient to constitute an emergency.[16]

> The decision to remove Sarah from school was made as early as Monday, January 8.  She was not taken from school until Tuesday at noon.  Defendants concede that a court order could have been obtained in one day.  ***The evidence suggests that the purpose of removing Sarah from school was not to sweep Sarah out of harm's way but rather to rule out sexual abuse.***  Based on those facts and the others recited in detail above, a properly instructed jury could conclude that at the time the caseworkers decided to remove Sarah, there was reasonably sufficient time, entirely consistent with Sarah's safety, to seek a court order.  If there was reasonably sufficient time, there was no emergency.  A jury could find that use of emergency, extra-judicial procedures was an infringement of the Tenenbaums' and Sarah's procedural due-process rights.

*Id.* at 595 (emphasis added).

Similarly, the facts underlying the *Roska* decision failed to rise to the level of an

emergency.  There a twelve-year old by came to school wearing a parka in 70 degree weather.  A

nurse noticed that he was sweating and appeared ill.  For several years, this child's psychiatrists

and doctor had suspected Munchuasen Syndrome By Proxy, but had been unable to substantiate a

---

"lightly," not realizing that they were unaware they were to phone him.  *Id.* at 590 & n.4.

[16]    The district court found that Williams, who ordered Sarah's removal, had probable cause, i.e., an objectively reasonable basis, to believe emergency circumstances existed because the substance of what the child communicated to Murphy . . . is essentially uncontroverted, viz. that Sarah's father hurt her through contact with her vaginal area at night. . . . This was enough to satisfy the district court that as a matter of law there were emergency circumstances that permitted Sarah's removal from school for a physical examination without a court order. . . .  We disagree.

*Tenenbaum,* 193 F.3d at 594.

diagnosis.  Likewise, school officials had observed suspicious circumstances and conversations

with the mother for at least a year.  On the day the child was removed from his mother's custody,

school officials thought the boy was becoming more ill, and they were concerned he "might die

unless [the social services agency] intervened."  The social worker assigned to investigate the

case, however, did not believe that the boy would die within the next month.  The police who

went to take the boy allegedly entered the residence without knocking or a warrant.  Before

leaving with the boy, the boy's doctor had "admonished [the officer] over the phone . . . that

removal could destroy 'this family emotionally and Rusty may never recover.'"  *Roska*, 328 F.3d

at 1238-39 & n. 3.   At a hearing a week later where presented with all of the pertinent facts, a

judge ordered the child immediately returned to his parents.  *Id.*

  The *Roska* decision held that as a matter of law, these facts likewise constituted a

nonemergency:

> Although defendants at times assert that a delay to obtain a warrant
> might have cost Rusty his life, the evidence shows otherwise.
> Defendants were aware that various doctors had suspected that
> Rusty was a victim of MSBP for quite some time, and the record
> indicates that there was nothing particularly unusual about Rusty's
> condition at the time he was removed.  Rusty's attending
> physician stated on the phone that it would be a mistake to remove him from
> the home.  Because no evidence indicates that Rusty was in
> immediate threat of death or severe physical harm – indeed the
> evidence points to the opposite conclusion – we do not find
> sufficient exigent circumstances to relieve the state actors here of
> the burden of obtaining a warrant.

*Id.* at 1240-41.  In the context of evaluating whether Plaintiffs met their two-prong burden for the

qualified immunity motions, the *Roska* court focused on this nonemergency finding when it

31

mentioned in passing that no *ex parte* warrant had been sought.[17]

An Eleventh Circuit decision squarely addresses the issue of whether a court can ever find an "emergency" if "there is time to obtain a court order without exacerbating the risk to the child." *Doe,* 329 F.3d at 1294. The *Doe* court

> was not persuaded that due process demands such an inflexible rule.
> Aside from our concerns about imposing a new and onerous burden
> on child welfare agencies . . . we do not believe that the single focus
> of a due process analysis ought to be on the court's schedule. . . .
>                          * * *
> [D]ue process is a flexible concept--particularly where the
> well-being of children is concerned--and deciding what process is
> due in any given  case requires a careful balancing of the interests at
> stake, including the interests of parents, children, and the state.
> Those interests may be implicated to varying degrees depending on
> the facts of an individual case, which will necessarily affect the
> degree of procedural due process required. This kind of subtle
> balancing cannot be properly accomplished when courts blunt the
> inquiry by simply asking whether there was time to get a warrant.

*Id.* at 1297-98. The Eleventh Circuit further determined that *Roska* as well as *Hollingsworth* are among those cases that hold if an emergency exists, then due process does not require a warrant prior to removal of the children. *See id.* at 1295-98 & n.13. After a careful reading of *Roska,* I am also persuaded that its holding does not go as far as *Tenenbaum,*.

Even with its new requirement to obtain a warrant if time permits, the *Tenenbaum* court

---

[17] *See* 328 F.3d at 1246 ("As we discussed above, plaintiffs have pled sufficient facts to demonstrate that emergency circumstances did not exist to justify Rusty's immediate removal from the home without notice or a hearing. Defendants did not even attempt to obtain an *ex parte* order. We therefore find that plaintiffs have sufficiently alleged a violation of their Fourteenth Amendment procedural due process rights."); *id.* at 1250 ("In this case, defendant afforded the Roskas no process prior to removing Rusty. Defendants did not even attempt to obtain an *ex parte* order. Further, defendants point to no extraordinary circumstances that would justify the complete absence of pre-deprivation procedural safeguards. . . . in this case, Rusty's health and safety were not in immediate danger. Thus, regarding plaintiffs' claim under the Fourteenth Amendment, clearly established law plainly put defendants on notice that their conduct violated the Constitution.").

was concerned that "ample" protection from suit is "essential" to enable social workers "to fulfill their crucial duties safely and effectively."  *See* 193 F.3d at 596-97.  The court relied on the second prong of the qualified immunity analysis to provide sufficient protection for social workers.  If a social worker's action was "objectively reasonable" in failing to get a warrant, qualified immunity protects her from suit  because of the "difficult alternatives" social workers face.

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse.  If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights.  If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights.  It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, which ever way they make it. . . .  The issue is not whether it was absolutely essential to remove the child  . . . .  The issue is whether is it was objectively reasonable for the defendants to make the decision that they made, and no rational jury could find that it was not.

*Id.* at 596 (quoting *van Emrik v. Chemung County Dep't of Soc. Servs.,* 911 F.2d 863, 866 (2nd Cir. 1990)).

In fact, courts in the Second Circuit since the *Tenenbaum* decision have gone straight to the objective reasonableness inquiry.  If they find an objective basis for the social worker or officer to believe an emergency existed given the facts they had at the time, then the constitutional question is resolved in favor of the defendant, without inquiring whether there was time to secure a warrant.  This rush to the "objectively reasonable" inquiry  is found even in cases where the facts illustrate there was arguably time to secure a warrant.  *E.g., Ward v. Murphy,* 330 F. Supp.

2d 83 (D. Conn. 2004); *Taylor,* 72 F. Supp. 2d 298, *Shapiro v. Kronfeld,* 2004 WL 2698889

(S.D.N.Y. 2004); *Pezzenti v. Capaldo,* 2004 WL 2377241 (D. Conn. 2004).

It seems highly unlikely that the *Roska* decision would incorporate the *Tenenbaum* "time

to secure a warrant" holding as the dispositive and sufficient inquiry, without also at least

discussing its interrelated "objective reasonableness" holding.  To the contrary, the *Roska* decision

defines the objective reasonableness inquiry completely differently, without any citation to

*Tenenbaum,* focusing on "extraordinary circumstances" such as reliance on a state statute or the

advice of an attorney.  *See* 328 F.3d at 1251-54.

For the foregoing reasons, I find that if the requisite exigent circumstances existed, there

was no need for the officers or CYFD to seek an *ex parte* order prior to the removal of Jasmine

and Ashley, even if they could have done so.

### C.  The Undisputed And Material Facts Establish An Emergency

I further find that Plaintiffs' evidence, even when viewed in the light most favorable to

them, do not establish a nonemergency.  In their view, the core material facts are: the doctors'

failure to exercise their authority to hold Jasmine, CYFD's designation of the matter as "P-1," and

Garcia's opinion that no "emergency" ever existed.  However, these facts are immaterial and do

not create an issue of fact concerning whether an "emergency" existed at the time when Arrey

concluded both girls should be taken into custody and when CYFD took steps to fully implement

that decision.

Even *Tenenbaum* holds that "the fact that a state official did not act immediately upon a

report of abuse, standing alone, proves nothing."  *Tenenbaum,* 193 F.3d at 595.   Rather, "[i]f *at*

***any time*** [the child] should have been removed for her protection . . . there [is] . . . , as a matter

of law, no violation of [the parents'] due process rights." *Id.* Thus, "a delay between the report

of imminent harm and the actual removal does not deprive the removal of emergent stature, . . .

provided that it was objectively reasonable for the case workers to believe that an emergency

existed at the time of removal." *Ward,* 330 F. Supp. 2d at 92 (citing *Tenenbaum* and *Doe*).

Moreover, Garcia's belief that there was no "emergency" itself illustrates that officials can

reach different but reasonable conclusions on the same set of underlying facts. Whether the social

worker actually believed that abuse had happened is irrelevant. The inquiry I must make is

whether there was evidence of abuse that gives an objective reason to fear danger was imminent.

*Taylor,* 72 F. Supp. 2d at 307 & n.5; *see also id.* at 308-09. Rather than creating an issue of fact

concerning whether an emergency existed as a matter of constitutional law, Garcia's contrary

conclusion is support for the very reason why the doctrine of qualified immunity exists. "[I]f

officers of reasonable competence could disagree on this issue, immunity should be recognized."

*See Malley v. Briggs,* 475 U.S. 335, 341 (1986).[18]

This case is not, as Plaintiff's suggest, a concern of abuse based solely on speculation such

as in those cases where there an anonymous tip is not sufficiently substantiated. *E.g., Croft v.

Westmoreland County Children & Youth Servs.,* 103 F.3d 1123, 1127 (3rd Cir. 1997). Nor is it a

situation where the officer waited for over a month to remove the child after a report of abuse.

*E.g, Mabe v. San Bernardino County, Dept. of Soc. Serv.,* 237 F.3d 1101, 1108 (9th Cir. 2001).

---

[18] *See also, e.g., Roska,* 328 F.3d at 1251 (Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law. . . .") (quoting *Malley*); *Coburn v. Nordeen*, 72 Fed. Appx. 744, 746 (10th Cir. 2003) (same); *Taylor,* 72 F. Supp. 2d at 309 (same); *Pezzenti,* 2004 WL at *6 (concluding that officers of reasonable competence could disagree on the legality of taking a child to the station pending further investigation -- "at worst, Defendant may have acted out of an abundance of caution").

Instead, the information CYFD and the officers had on February 20th is undisputed: Jasmine was an eleven-month-old infant and had been taken to the emergency room twice within one week; she had a broken arm and some sort of hip injury; medical personnel found the mother's explanation for the injuries incongruous with the nature of the injuries; they were concerned enough to make a report to CYFD; and the condition of the bed from which Jasmine allegedly fell did not give reason to dispel disbelief of the explanation.

Arrey removed Jasmine immediately and would have removed Ashley at that time as well had Garcia not disagreed and had he not been under the impression he had no other recourse but to leave Ashley with her parents. Arrey did not let the matter of Ashley rest, however. He conveyed his concerns through his report and to his supervisor, and on February 21st the same facts existed. In addition, Jasmine had been placed with a relative who sided with the parents position that the doctors were to blame and that there was no possibility that *anyone* could have abused Jasmine. Thus, Garcia and Arrey's actions the night before did not eliminate the danger to either child, and Locklear and others rectified the situation immediately.

> It is not necessary, for emergency circumstances to exist, that the child be harmed in the presence of the officials or that the alleged abuser be present at the time of the taking. Rather, it is sufficient if the officials have been presented with evidence of serious ongoing abuse and therefore have reason to fear imminent recurrence. . . . Further, the officials need not defer action merely on account of a parent's protestations of innocence or promises of future protection if they have evidence that that parent has been unwilling or unable to assure the children's safety and well-being in the past.

*Robison v. Via,* 821 F.2d 913, 922 (2nd Cir. 1997).

The undisputed facts here support the conclusion that Jasmine's immediate safety was in

36

danger.  A number of decisions based on similar or less compelling facts so hold.[19]  Thus, this case

---

[19]  *See e.g., Hatch v. Department for Children, Youth & Families,* 274 F.3d 12, 25 (1st Cir. 2001) (teacher, principal, and school nurse observe bump on head and red marks on neck, after first maintaining injuries were result of fall, boy stated his father caused the injuries, agency takes child to hospital  where doctor was of opinion injuries were consistent with abuse; held emergency existed and stating doctor's "expert authority in medicine are powerful indicators of reliability")*; White by White v. Chambliss,* 112 F.3d 731, 736 (4th Cir.) (emergency action supported where case worker received opinion of two medical professionals that injuries were strong evidence of child abuse and, while elicited parent's explanation, was entitled to rely on professional judgment of physicians that the explanation was unlikely, as well as own examination of crib that led caseworker to conclude the explanation was unlikely), *cert. denied,* 522 U.S. 913 (1997);  *Thomason v. SCAN Volunteer Servs., Inc.,* 85 F.3d 1365, 1371 (8th Cir. 1996) (doctor's suspicion of abuse based on circumstantial evidence supplied reasonable suspicion of abuse justifying removal from home; "Defendants reasonably could have assumed that [the doctor] was highly knowledgeable and experience in these matters and lacked any motive to lie"); *Hodorowski v. Ray,* 844 F.2d 1210, 1217 (5th Cir. 1988) (report that father was chasing children with chain, observed bruises, children said they had more bruising under clothes; although children did not need emergency medical treatment, social worker did not know when father would return or if he would threaten children again); *Robison,* 821 F.2d at 922 (report of neighbor that her daughter and other schoolmates mentioned the two children at issue had told they had been sexually and physically abused by their father/stepfather; when officers approached the children, one began to cry and the other made a statement that implicated his stepfather and was fearful of getting beaten; when questioned, the mother defended the father);  *Lossman v. Pekarske,* 707 F.2d 288, 292 (7th Cir. 1983) (stepmother complained father was hitting children and informed officer that he had guns in the house); *Ward,* 330 F. Supp. 2d 83, 91-94 (parents of newborn were mentally disturbed and much time elapsed between initial concern and report of suspected abuse and removal, and in the interim a nurse reported the baby was fine; nevertheless facts justified emergency removal because physician was concerned that parents would not properly care for newborn with jaundice and it was imperative to have the child seen by a doctor; father was refusing to cooperate; and  after removal court granted a temporary order of custody, even though it ultimately reversed itself); *Taylor,* 72 F. Supp. 2d at 307, 309 (serious injuries to infant while in parent's care; unbiased physician who examined child, was of opinion that injuries indicated child abuse and specifically reported the same; lack of consistent explanation for injury by parent, regardless of whether another explanation subsequently surfaces; removal was immediate; court subsequently ratified the decision to remove, even though in the end it ruled the other way; suffices for emergency of the injured child ***and*** other children in the home); *Kia P.,* 2 F. Supp. 2d at 291 (positive toxicology screen of newborn raising concern of exposure to methadone in utero was sufficient); *Dietz v. Damas,* 932 F. Supp. 431, 444-45 (E.D.N.Y 1996) (infant rushed to hospital, where dr. assesses Whiplash Shaken Infant Syndrome and parents are possible suspects, another doctor confirmed diagnosis and this was sufficient for agency to take immediate custody of infant; agency then let  grandparents take baby for Christmas and they agreed to supervise parents around the baby; after the baby was taken back to hospital, doctors could not pinpoint time of injury and this was sufficient for agency to take custody of the baby again and not return it to the grandparents); *Shapiro,* 2004 WL at *15 (male teenager's rendition of punishments inflicted by his mother (locking him in room, out of apartment, hitting him with shoe, dumping cold water on him) was confirmed by sister; mother admitted some of the things (she found teenager unmanageable and angry after divorce and put him in counseling), and teenager said he was afraid to go home was sufficient); *Pezzenti,* 2004 WL  at *1-3, 5 (child claimed false arrest for being taken from parents when eleven years old; at that time he called 911, saying his mother hit him;

is unlike the critical facts in *Roska,* where the suspicions about the boy went on for years and his doctor advised against taking the boy.  It is unlike *Tenenbaum,* where no physical problem had been confirmed at the time the child was taken and her parents' alleged negative reaction was entirely the product of a misunderstanding.

Moreover, at least one decision squarely holds that the "targeted child" theory is sufficient to justify taking siblings into custody.  *See, e.g., Taylor,* 72 F. Supp. 2d at 309; *c.f., Tower v. Leslie-Brown,* 326 F.3d 290, 298 (1st Cir. 2003) (three children's report of abuse led to objectively reasonable suspicion of abuse as to all five); *Doe,* 329 F.3d  at 1290-91 & n.7 (one child target of abuse, officers took all children into custody and taken to grandparents); *Officers' Mem.* at 15 (State of New York decisions cited therein); *Locklear Mem.* at 18 (same).  Therefore, the defendants actions were objectively reasonable in also taking custody of Ashley to assure her safety as well.

Based on the analogous facts and reasoning of these decisions, I find that Plaintiffs have failed to allege the violation of procedural due process and, therefore, fail to sustain their burden on the first prong of the qualified immunity inquiry.

### D.  Law Is Not Clearly Established

Even if I am incorrect concerning the scope of the *Roska* holding and whether the undisputed evidence establishes as a matter of law that an emergency existed, Plaintiffs also fail to sustain their burden on the second prong.  The law must be clearly established such that Defendants are given "fair warning" that their conduct is unconstitutional.  *Hope v. Pelzer,* 536

---

officers responded and noticed cut lip; mother acknowledged slapping son; boy said he got hit by one parent at least once a week and, although he was not afraid to be at home, he did not want to get hit anymore).

U.S. 730, 739-40 (2002).

> Qualified immunity shields an office from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. . . . Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  if the law at that time did not clearly establish that the officer's conduct wold violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

> It is important to emphasize that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."

*Brosseau,* ___ U.S. at ___ 125 S. Ct. at 599.  Where, as here, a plaintiff relies on decisions that are "cast at a high level of generality," those decisions must be "obvious cases" of unconstitutionality to "clearly establish the answer [to the situation at hand], even without a body of relevant case law."  *Id.* (internal quotations omitted).

Like the Supreme Court in *Brosseau,* I do not find that *Roska* or *Hollingsworth* set constitutional standards that make it obvious the decision to remove the children on an emergency basis here was clearly unconstitutional.  Rather, as discussed above, they simply set forth the general and long-standing constitutional principle that if an emergency exists, then a warrant is not required before removing children.  The facts of those cases are so different, almost diametrically so, from the facts of the case before me.  Application of the law to the facts there likewise does not clearly establish that an emergency did not exist in this situation, or that the sibling of a removed child cannot also be removed, or that even if an emergency exists, warrants must nonetheless be obtained if there is time to do so.  In other words, I cannot "'say that in the light of pre-existing law [in the Tenth Circuit] the unlawfulness [of Defendants' conduct is] apparent.'"

*Mimics,* 394 F.3d at 841 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, (1987)).

The Tenth Circuit recently reiterated that the "'law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains.'" *Id.* (quoting *Roska,* 328 F.3d at 1248); *see also Tanberg v. Sholtis,* 401 F.3d 1151 , 1160 (10th Cir. 2005). Plaintiffs have not pointed to any Supreme Court or Tenth Circuit decisions that are on point at a more particularized level, or to other court decisions except to note *Roska*'s citation to *Tenenbaum.*

Based on my own review of relevant authorities and the discussion above, the weight of authority from other courts shows that the facts of this case fall within squarely within the "emergency" end of the spectrum. In my view, this case does not present the "exceptional circumstances" where any material "historical facts" are in dispute and "so intertwined with the law that a jury question is appropriate as to whether a reasonable person in the defendant's position would have know that his conduct violated [a clearly established] right." *Maestas v. Lujan,* 351 F.3d 1001, 1007 (10th Cir. 2003); *Roska,* 328 F.3d at 1251 & n. 28.

Wherefore,

**IT IS HEREBY ORDERED THAT:**

1.  Defendants' motions for summary judgment on the issue of qualified immunity *(Docs. 84, 89, 91)* are GRANTED;

2.  Plaintiffs' cross-motion for summary judgment *(Doc. 87)* is DENIED AS MOOT;

3.  Defendants' requests for oral argument *(Docs. 101, 107)* are DENIED AS MOOT;

4.  The pretrial conference and trial set for May 9, 2005 and June 27, 2005, respectively, are VACATED; and

5.      A final order enter concurrently herewith.


_____
UNITED STATES MAGISTRATE JUDGE